**FORT HOWARD PAPER COMPANY,**
**Plaintiff-Appellee,**

v.

**WILLIAM D. WITTER, INC., Thomas McKinnon Securities, Inc. and Charles F. Huber, Defendants,**

**Thomas McKinnon Securities and Charles F. Huber, Defendants-Appellants,**

**Charles F. HUBER, II, Third-Party Plaintiff-Appellant,**

v.

**FORT HOWARD PAPER COMPANY and Maryland Cup Corporation, Third-Party Defendants-Appellees.**

**No. 453, Docket 85–7551.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1985.
Decided March 27, 1986.

Sanford Litvack, New York City (Charles W. Gerdts, III, Valerie A. Cohen, Donovan Leisure Newton & Irvine, New York City, of counsel), for plaintiff-appellee.

Elliot Paskoff, New York City (Harry T. Walters, Townley & Updike, New York City, of counsel), for defendants-appellants.

Before VAN GRAAFEILAND, NEWMAN and MINER, Circuit Judges.

MINER, Circuit Judge:

Charles F. Huber, II ("Huber") and Thomson McKinnon Securities, Inc. ("Thomson McKinnon") appeal from a judgment of the United States District Court for the Southern District of New York (Keenan, J.), declaring that appellee Fort Howard Paper Company ("Fort Howard") was not liable in contract to either Huber or Thomson McKinnon for a finder's fee in connection with the 1983 merger between Fort Howard and the Maryland Cup Corporation ("Maryland Cup"). The judgment also dismissed counterclaims for fraud asserted by Huber against Fort Howard and Maryland Cup. The appeal also seeks review of Judge Keenan's denial of appellant's motion to stay, dismiss or transfer this declaratory judgment action, 578 F.Supp. 301. We affirm Judge Keenan's ruling on the motion to stay, dismiss or transfer the declaratory judgment action. We also affirm Judge Keenan's decision on the contract claims but reverse and remand on the fraud claims.

## I. BACKGROUND

The facts precipitating this controversy are, for purposes of this appeal, largely undisputed. Huber, a citizen and resident of Connecticut, was employed in New York City as a promoter of mergers and acquisitions by Thomson McKinnon until June of 1981, when he joined the New York firm of William D. Witter, Inc. ("Witter") in a similar capacity. In January of 1980, Gerald

Zentz, a Thomson McKinnon Vice-President in the firm's Baltimore office, learned that Maryland Cup was interested in being acquired by another corporation. Zentz called Dr. Albert Shapiro, a former Maryland Cup Officer and Director, and offered Thomson McKinnon's services in locating an acquiring company. The next month, Shapiro, on behalf of Maryland Cup, accepted Thomson McKinnon's offer to act as a finder.

A few months prior to this agreement, Dean Porter, another Thomson McKinnon employee, had offered Thomson McKinnon's services to procure suitable merger candidates for Fort Howard. In May of 1980, Arnold Janofsky, Assistant to the President at Fort Howard, accepted Thomson McKinnon's offer and requested assistance in locating an "interesting situation." In a letter to Porter, Janofsky described the type of company Fort Howard was interested in acquiring and noted that "we would appreciate it if you would contact us with available facts and information including your fee, if any." At this point, both Zentz and Porter solicited Huber's involvement. From his New York office, Huber called Janofsky in Wisconsin and advised him that he had two possible acquisitions in mind for Fort Howard. Huber promised to try to arrange a meeting with the principals of each company, and Janofsky told Huber that Fort Howard would pay the customary finder's fee to Thomson McKinnon if a merger or acquisition were to be consummated.

On June 3, 1980, Huber telephoned Janofsky in Wisconsin and told him that he believed Maryland Cup would be a suitable acquisition for Fort Howard. Janofsky expressed interest and requested more information. Huber then telephoned Merrill Bank, Maryland Cup's Chairman, and scheduled a meeting at Bank's summer home on Cape Cod. Huber met with Bank on July 11th, and the two discussed the general possibility of Maryland Cup being acquired by a company like Fort Howard. Bank expressed great enthusiasm over such a prospect and Huber revealed the identity of Fort Howard as a likely acquiring company. Bank apparently was excited by this idea and promised Huber that he "would be protected with respect to a finder's fee." Huber had indicated to Bank that an appropriate fee would be one-percent of the value of the merger transaction (which ultimately amounted to $570,000,000). Bank reiterated his interest and suggested that Huber set up a meeting with Fort Howard's President, Paul Schierl, promising that if Fort Howard did not pay Huber's fee, Maryland Cup would.

One week later, on July 18, 1980, Huber placed a call to Janofsky in Wisconsin. He was referred to Walter Charles, a Fort Howard Senior Vice-President who had replaced Janofsky. Huber informed Charles of his earlier discussions with Janofsky concerning a possible Fort Howard-Maryland Cup merger and of Bank's desire to meet with Schierl. He also informed Charles that Janofsky had agreed to a one-percent finder's fee to be paid upon conclusion of the merger. Finally, Huber told Charles that, although Bank had offered to protect him with respect to a fee, he still considered himself to be working for Fort Howard and would look to it for his fee. Charles responded that that was "fine."

Subsequent to this conversation, Charles was replaced as Huber's contact on the Maryland Cup transaction by Gerald Korb, an Assistant Vice-President for Finance at Fort Howard. Huber wrote to Korb on August 27, 1980, describing the fee agreement that had been reached with representatives of both Maryland Cup and Fort Howard. Throughout September and October of 1980, Huber spoke with Korb in an effort to arrange a meeting between Schierl and Bank. After a number of changes and cancellations, Huber managed to schedule the meeting for October 21, 1980. Bank and Schierl met that day in a Chicago hotel room reserved by Huber; Huber was not invited to attend the meeting. In a memorandum to the file dated October 28, 1980, Schierl described the meeting and reported the following:

Bank said he did have a meeting with Huber and that the subsequent events leading to our meeting were with his knowledge and in Bank's opinion if any deal was ever consummated, Huber would be entitled to some sort of a finder's fee.

* * * * * *

We agreed that we would contact Huber and say that if we do anything further it will be plant visits, and just generally cool our relationship with him.

After the meeting, Huber made a number of calls to Fort Howard to find out what had transpired. Huber also asked Korb for written confirmation of their finder's-fee agreement. Korb orally reassured Huber that Fort Howard would pay the fee and that he should stop worrying about it. Huber tried to keep abreast of the negotiations by speaking with both Korb and Bank. Although Bank assured Huber that negotiations were progressing, Korb insisted that the merger was dead. Concerned by these inconsistent reports, Huber sought guidance from Schierl, who reassured Huber that negotiations were proceeding on course. Schierl reaffirmed his promise to pay the finder's fee and asked that Huber continue to provide Fort Howard with information. He refused to provide a fee letter, however, explaining that it would involve disclosure of the negotiations to the Fort Howard Board of Directors and a consequent compromise of the secrecy essential to the success of the negotiations.

On February 23, 1981, Huber traveled to Wisconsin to meet with Schierl and Timothy Twomey, who had replaced Korb as Huber's contact at Fort Howard. Huber spoke with Twomey throughout 1981. At Twomey's request, Huber prepared a "pro forma" analysis of a Fort Howard-Maryland Cup merger. After completing that analysis, Twomey informed Huber that nothing further was needed.

In May of 1981, Huber called Twomey to advise him that he was leaving Thomson McKinnon to join Witter. He similarly advised Schierl by letter. On June 1, 1981, Twomey sent a letter to Thomson McKinnon, with a copy to Huber, stating that Fort Howard "has not agreed to retain either Huber or your corporation as a finder, investment banker or otherwise in connection with the proposed acquisition with Maryland Cup." Huber called Twomey to question him about the letter, stating that his new employer, Witter, wanted assurances that Huber was acknowledged as the finder in the Fort Howard-Maryland Cup merger. Twomey reassured Huber that the only reason for the letter was to ensure that no one at Thomson McKinnon took Huber's place in the Fort Howard-Maryland Cup transaction after Huber's departure. Huber expressed his desire to visit Fort Howard in Wisconsin with William Witter to confirm that understanding, and Twomey agreed. In a letter to Schierl dated June 7, 1981, Huber reaffirmed his faith in Fort Howard's "sense of fairness," and Schierl responded that he would be in touch with Huber. Huber and Witter visited Schierl at Fort Howard's Wisconsin offices and discussed the status of the merger.

On March 9, 1982, Huber called Twomey and was advised that the merger was dead. Huber later learned that the respective Boards of Directors had in fact agreed to the merger, subject to shareholder approval. On August 18, 1983, Huber's counsel wrote to Schierl, informing Fort Howard that Huber expected to be compensated as the finder in the merger transaction. Thereafter, Huber's counsel spoke with Fort Howard's counsel on a number of occasions to explore the possibility of resolving the parties' dispute. On September 6, 1983, Huber's counsel was informed that Fort Howard had instituted this declaratory judgment action.[1]

---

**1.** According to Huber, "[w]hile counsel for the parties were discussing settlement, Fort Howard was actually preparing its declaratory judgment complaint to be filed in the Southern District of New York, so as to enable the Wisconsin based

Fort Howard to avoid *Schaller v. Litton Industries, Inc.,* 307 F.Supp. 126 (E.D.Wisc. [sic] 1969), the leading Wisconsin federal court precedent on finder's fees." Fort Howard, on the other hand, contends that there were no

Two-and-one-half months later, Huber commenced an action to recover his finder's fee in the Eastern District of Wisconsin. He thereafter moved to dismiss, stay or transfer the instant action pending completion of the Wisconsin suit. Judge Keenan denied that motion, 578 F.Supp. 301, on the basis of our decisions in *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir.), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1969), and *William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177 (2d Cir.1969). The Wisconsin action was then dismissed by stipulation without prejudice.

■ After the close of discovery, the parties briefed what all conceded to be the dispositive issue of choice of law. Although no formal motion was made, Judge Keenan and the parties then agreed that the action could be disposed of by summary judgment. Thereafter, Judge Keenan ruled in Fort Howard's favor, declaring there existed no finder's-fee liability, and dismissing Huber's counterclaims. First, Judge Keenan held that *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), compelled the application of New York law. Applying that law to the contract claims, Judge Keenan concluded that the writings tendered by Huber were insufficient to satisfy the requirements of the New York Statute of Frauds,[2] and that the fraud claims similarly were barred because they were nothing more than restatements of the contract claims. On this basis, Judge Keenan also dismissed Huber's quantum meruit claims. With respect to claims based on a theory of promissory estoppel, Judge Keenan found that Huber

had failed to allege or prove the existence of written agreements prior to or contemporaneous with the alleged oral promises and that the facts failed to establish the existence of a "substantial injury" or "especial harm." *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977). Judge Keenan also questioned the reasonableness of Huber's alleged reliance, an element necessary to excuse compliance with New York's strict Statute of Frauds requirements.[3]

We see no error in the district court's disposition of the contract claims, or in its ruling on the motion to transfer, stay or dismiss. However, because we conclude that Judge Keenan erred in dismissing the fraud claims, we remand the matter for further proceedings.

## II. DISCUSSION

### A. Transfer, Stay or Dismissal of the Declaratory Judgment Action

■ Facing the formidable obstacle of New York's Statute of Frauds, which would bar his contractual claim to any finder's fee, Huber, not surprisingly, is anxious to see this dispute resolved in Wisconsin where, he believes, the courts are more likely to apply Wisconsin law, under which Fort Howard's oral promise would be enforceable. *See Ehrman v. Cook Electric Co.*, 630 F.2d 529 (7th Cir.1980); *Schaller v. Litton Industries, Inc.*, 307 F.Supp. 126 (E.D.Wis.1969). Accordingly, he presses on appeal his claim that this action should have been either transferred to Wisconsin or stayed or dismissed pending resolution of the now discontinued Wisconsin action.

settlement negotiations, that no party had made any settlement offer and that it had categorically denied all liability and had emphatically stated that it saw no basis on which to settle.

2. Under New York law, any "contract to pay compensation for services rendered in ... negotiating the purchase, sale [or] exchange ... of a business opportunity [or] business," whether the contract be "implied in fact or in law to pay reasonable compensation," is void unless "it or some note or memorandum thereof be in writ-

ing, and subscribed by the party to be charged therewith...." N.Y.Gen.Oblig.Law § 5-701(a)(10) (McKinney Supp.1986). There is no doubt that § 5-701(a)(10) bars oral finder's-fee contracts. *See Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 266, 401 N.Y.S.2d 176, 180, 372 N.E.2d 12 (1977).

3. Huber has abandoned his promissory estoppel claims on appeal, and, accordingly, we do not reach them.

■ Judge Keenan properly noted this Circuit's general rule that a declaratory judgment action should be entertained "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview*, 417 F.2d at 1001 (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). Judge Keenan also correctly recognized that where there are two competing lawsuits, "the first suit should have priority, 'absent the showing of balance of convenience in favor of the second action,' or unless there are special circumstances which justify giving priority to the second." *William Gluckin*, 407 F.2d at 178 (quoting *Remington Products Corp. v. American Aerovap, Inc.*, 192 F.2d 872, 873 (2d Cir. 1951)). We have no doubt that the present declaratory judgment action satisfied the *Broadview* criteria, and we are not prepared to say that Judge Keenan abused his discretion in finding the absence of any of *William Gluckin's* "special circumstances." Accordingly, we find no error in his decision to deny Huber's motion to stay, transfer or dismiss.

## B. *The Substantive Claims*

### 1. *Contract Claims*

■ The parties' principal focus on this appeal concerns Judge Keenan's determination that New York law governs the enforceability of the oral contract. In so holding, Judge Keenan relied almost entirely on the New York Court of Appeals decision in *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y. S.2d 817, 248 N.E.2d 576 (1969). In a factual context similar to that presented here, the issue before the New York Court of Appeals was whether to apply the law of New York, whose Statute of Frauds would bar a finder's-fee recovery, or the law of New Jersey, whose Statute of Frauds did not extend to oral finder's-fee agreements. The court determined that the law of the jurisdiction having the greatest interest in the litigation should apply, provided that that jurisdiction possessed sufficient contacts with the litigation. Although we consider the choice of law question a close one, we agree with Judge Keenan's application of *Daystrom* and his conclusion that New York law should govern.

First, we think it clear that New York bears enough contacts with the instant dispute to justify application of its law. For example, Huber and Thomson McKinnon are based in New York City and conduct business there; numerous letters and phone calls precipitating the ultimate merger emanated from defendant Huber's New York office. Indeed, nearly all the services for which Huber seeks compensation were rendered in New York. *See Daystrom*, 24 N.Y.2d at 384, 300 N.Y.S.2d at 827, 248 N.E.2d 576; *Pallavicini v. International Telephone & Telegraph Corp.*, 41 A.D.2d 66, 68, 341 N.Y.S.2d 281, 283 (1st Dep't 1973) (activities of Rome resident in placing telephone calls and writing letters from New York sufficient to permit application of New York Statute of Frauds), *aff'd mem.*, 34 N.Y.2d 913, 359 N.Y.S.2d 290, 316 N.E.2d 722 (1974). Admittedly, some of the events underlying the lawsuit transpired outside New York; nonetheless, we are satisfied that New York had sufficient contacts so as not to render application of its law fundamentally unfair.

Second, on the basis of *Daystrom*, we are persuaded that New York enjoys the paramount interest in resolution of this action. The *Daystrom* court emphasized one of the important legislative purposes underlying the Statute of Frauds: to reduce the substantial number of unfounded and multiple claims for commissions asserted by finders. 24 N.Y.2d at 383, 300 N.Y.S.2d at 826, 248 N.E.2d 576. This purpose was particularly compelling in light of New York's traditional role as "a national and international center for the purchase and sale of businesses ...," and its position as "an international clearing house and market place." *Id.* at 383–84, 300 N.Y.S.2d at 826–27, 248 N.E.2d 576; *see also Hutner v. Greene*, 734 F.2d 896, 899–900 (2d Cir.

1984). Although, as appellants point out, a number of factual distinctions exist between *Daystrom* and the present case regarding the degree of contacts with New York,[4] we view them as insufficient to compel a different result.

Similarly, although both Maryland and Wisconsin may have legitimate interests in the resolution of this controversy, we see none sufficient to outweigh that of New York. As the *Daystrom* court made clear, "the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." 24 N.Y.2d at 382, 300 N.Y.S.2d at 825, 248 N.E.2d 576 (quoting *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877 (1968)). Unquestionably, Wisconsin and Maryland have an interest in protecting the expectations of contracting parties by holding them to their respective promises, although in this case any such interest is diminished by the fact that Huber is a resident of neither state. This general policy, however, must yield to New York's unique concern for the problems associated with oral finder's-fee arrangements. New York's status as an "international clearing house and market place" would be severely eroded were the more general interests of either Wisconsin or Maryland held to govern the relationship at issue here.

█ Accordingly, we agree with Judge Keenan that New York law must govern resolution of the contract claim. Applying that law, we see no error in the district court's finding that there existed insufficient writings to satisfy the Statute of Frauds. None of the documents offered by Huber, alone or together, are sufficient to constitute a writing, signed by the party to be charged, which contains either "expressly or by reasonable implication all the material terms of the agreement...." *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575, 297 N.Y.S.2d 947, 953, 245 N.E.2d 712 (1969). Although the documents submitted contain mention of a finder's fee, nowhere is there reasonably to be found any promise to pay or the recognition of any obligation to pay such a fee.[5]

**4.** In *Daystrom*, (1) the defendant came to New York to obtain the services of a finder; (2) the finder sought a suitable acquisition in New York; (3) the acquired corporation had responded to the finder's New York solicitation in the New York Wall Street Journal; (4) the finder introduced the principals of the merger to each other in New York; (5) a finder's-fee agreement was negotiated in New York between the parties; and (6) the principals agreed to compensate the finder during a meeting in New York. From these facts, appellants contend that "*Daystrom's* rationale applies only when a principal comes into New York, relying on its reputation as an international clearing house for business, to seek a finder. Where an out-of-state principal does not initiate the contact with a New York finder, the finder's location in New York becomes fortuitous." We do not read *Daystrom* so narrowly. In holding that the Statute of Frauds protects foreign principals "who come into New York," the Court of Appeals sought to extend the rule's protection to all non-New York residents who take advantage of the state's position and reputation as a market place and clearing house; it did not seek to protect only the more limited class of those who actively seek out New York as a forum for their transactions. Indeed, as Judge Keenan found, Huber was a beneficiary of New York's policy of encouraging foreign principals to use New York finders, safe in the knowledge that the laws of New York would offer them protection from unfounded claims of oral promises.

**5.** For example, the most important writing offered by Huber is Janofsky's letter to Porter at Thomson McKinnon suggesting that Fort Howard might be interested in a potential acquisition. The letter requested Porter to contact Fort Howard "with available facts and information including your fee, if any." There certainly is to be found no promise to pay a finder's fee in that invitational language. The second writing offered by Huber is an internal Fort Howard memorandum authored by Schierl following his meeting with Merrill Bank, Maryland Cup's Chairman. The memorandum indicates that *Bank* thought Huber would be entitled to a finder's fee; it is silent as to any acknowledgment of obligation by Fort Howard, with whom Huber claims to have contracted. The remaining documents are even less helpful to Huber, consisting of two of his own letters to Fort Howard detailing his concerns over the absence of a fee letter, another Fort Howard internal memorandum, pointing out that Huber had expressed such concerns, and finally, a Fort Howard letter to Huber flatly disclaiming any finder's-fee liability. The district court did not err in concluding that these writings were insufficient as a matter of law to satisfy the Statute of Frauds.

Absent the necessary writing, Huber is barred by the Statute of Frauds from asserting his contract claim.

### 2. *Fraud Claims*

 Judge Keenan also applied New York law in dismissing the fraud claims. In essence, Huber asserted two instances of fraudulent misrepresentation. First, he alleged that Bank, Maryland Cup's Chairman, had falsely promised to pay his finder's fee in return for his disclosure of the prospective acquiring company: He claims to have relied on that misrepresentation in undertaking further efforts toward negotiating the merger, not seeking other suitable acquisitions for Fort Howard, and not seeking further protection of his fee arrangement. Second, Huber alleged that Schierl, Fort Howard's President, fraudulently misrepresented that he could not issue a fee letter but that Fort Howard would nonetheless pay his fee. In reliance on these two statements, Huber claims to have continued his efforts at promoting the merger.

Judge Keenan quite properly recognized that a party barred by the Statute of Frauds from pursuing a breach of contract claim is not necessarily barred from pursuing an action in tort. *See Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 263, 151 N.E.2d 833 (1958) ("The policy of the statute of frauds is 'not directed at cases of dishonesty in making' a promise; never intended as an instrument to immunize fraudulent conduct, the statute may not be so employed.") (quoting W. Prosser, *Prosser on Torts* § 90, at 565 (2d ed. 1955)); 4 S. Williston, *A Treatise on the law of Contracts* § 567A, at 19–20 (3d ed. 1961) ("The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made." (footnotes omitted)). On the basis of *Intercontinental Planning, Ltd. v.*

*Daystrom, Inc.,* 30 A.D.2d 519, 290 N.Y. S.2d 206 (1st Dep't 1968), *aff'd,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), however, he concluded that it would " 'be incongruous and subversive of the legislative intent to permit a plaintiff in a finder's fee case to avoid the Statute of Frauds by relabeling his claims a ... 'misrepresentation.' ' " Slip. op. at 25 (quoting 30 A.D.2d at 519, 290 N.Y.S.2d at 206).

Relying on *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958), Judge Keenan reasoned that, in order to separate real fraud claims from contract claims disguised as fraud claims, courts must look to the type of injury alleged. *Channel Master* involved an action for fraud stemming from two alleged misrepresentations. According to the plaintiff, the defendant had represented that "its available and uncommitted supplies and productive capacity of aluminum ingot, then existing, were such as rendered it then capable of selling to the plaintiff 400,-000 pounds per month and that it had entered into no binding commitments with other customers which could in the future reduce such available and uncommitted supplies and productive capacity." 4 N.Y.2d at 405, 176 N.Y.S.2d at 261, 151 N.E.2d 833. The defendant also represented to the plaintiff that it intended to make that 400,000 pounds available to the plaintiff for a period of five years. Relying on those representations, the plaintiff made no efforts at procuring aluminum elsewhere, only to discover later that the defendant had in fact previously entered into long-term contracts with other customers which committed all of the defendant's supplies and productive capacity for many years to come. The Court of Appeals rejected a facial challenge to the complaint based on a Statute of Frauds defense, holding:

The present action is in tort, not contract, depending not upon agreement between the parties, but rather upon deliberate misrepresentation of fact, relied on by the plaintiff to his detriment. In other words, the "legal relations" binding the parties are created by the utterance

of a falsehood "within a fraudulent intent" and by reliance thereon and the cause of action is entirely "independent of contractual relations between the parties." As we wrote in Sabo v. Delman, 3 N.Y.2d 155, 159, 164 N.Y.S.2d 714, 716 [143 N.E.2d 906], "it is well to bear in mind that the complaint before us neither asserts a breach of contract nor attempts to enforce any promise made by defendants." If the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery, but, on the other hand, one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability *in tort* whether the agreement is enforcible [sic] or not.

4 N.Y.2d at 408, 176 N.Y.S.2d at 263, 151 N.E.2d 833 (citations omitted) (emphasis in original).

▮ Judge Keenan pointed to the significant fact that, in *Channel Master*, the plaintiff specifically sought damages incurred in reliance on the defendant's misrepresentations and that the complaint neither asserted a breach of contract nor attempted to enforce any promise made by the defendant. "Thus, the fraud claim was actionable because the injury alleged was the detriment actually suffered by plaintiff rather than the value of what defendant promised." Slip op. at 27. On the other hand, Judge Keenan noted, "if the only interest at stake is that of holding a party

to a promise, the party seeking relief 'may not transmogrify the contract claim into one for tort.'" *Id.* (quoting *Hargrave v. OKI Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980)); *see also Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294–95 (2d Cir.1986); *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 85 (2d Cir. 1982). Here, Judge Keenan found, Huber sought to recover only his commission along with punitive damages, thereby foreclosing the availability of any fraud claim.[6]

▮ We reject this conclusion for two reasons. First, although not discussed by Judge Keenan, Huber's request for punitive damages distinguishes the fraud claims from those in contract. Generally, of course, punitive damages are not allowed in contract actions, while they quite properly are in tort actions. *See Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir.1985); *Brink's Inc. v. City of New York*, 717 F.2d 700, 704–05 (2d Cir.1983); *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793 (1976). Without a finding that Huber could not recover punitive damages as a matter of law, Judge Keenan erroneously construed the fraud claims as identical to those in contract.

▮ Second, and more important, we conclude that Judge Keenan erred in dismissing Huber's otherwise well-pleaded fraud claims simply because the *ad damnum* demands were too high. "[I]f a tort

---

**6.** Critical to this conclusion was Judge Keenan's determination that New York law would govern the fraud claim. Under New York law, the measure of damages for fraud is governed by the "out-of-pocket rule," *e.g., Dress Shirt Sales, Inc. v. Hotel Martinique Assocs.*, 12 N.Y.2d 339, 343, 239 N.Y.S.2d, 660, 663, 190 N.E.2d 10 (1963), which permits recovery for a plaintiff's reliance interest, i.e., "the costs incurred ... in preparation or in performance or in passing up other business opportunities." *Soper v. Simmons Int'l, Ltd.*, No. 84–CIV–70 (LBS), slip op. at 6 (S.D.N.Y. May 30, 1984). Under Wisconsin and Massachusetts law, however, both of which Huber argued should apply in this case, a plaintiff is entitled to recover the "benefit of the bargain" on a fraud claim. *Rokowsky v. Gordon*, 501 F.Supp. 1114, 1123 (D.Mass.1980); *Harweger v. Wilcox*, 16 Wis.2d 526, 114 N.W.2d 818, 822–23

(1962). The benefit of the bargain here, of course, would be the finder's fee claimed by Huber; out-of-pocket expenses, however, would be limited to those costs incurred by Huber in reliance on the alleged fraudulent misrepresentations, which might well fall short of the nearly $6,000,000 claimed as a finder's fee.

Were New York's measure of damages not to apply, the foregoing contract/fraud analysis would lose relevance since both fraud and contract claims would afford equal damage measures. Indeed, Judge Keenan specifically stated that under the law of Wisconsin or Massachusetts, in contrast to that of New York, a plaintiff barred from asserting a contract claim by the Statute of Frauds could seek to recover his finder's fee under a theory of fraud.

has been committed, it makes little sense to nonsuit the victim merely because he has pleaded an improper measure of damages." Note, *The Statute of Frauds as a Bar to an Action in Tort for Fraud*, 53 Ford.L. Rev. 1231, 1236 (1985) (footnote omitted); *see Lehman v. Dow Jones*, at 296. There is no doubt that Huber's fraud claims mirrored his claims on the contract with respect to the damages sought. Liberally construed, however, the fraud claims reasonably subsume damages incurred in reliance on the alleged fraudulent misrepresentations. And, despite having failed to articulate a specific reliance figure, Huber should nonetheless be entitled to recover his out-of-pocket losses after trial should he prevail on his claims of fraud. His complaint should not have been dismissed simply because he sought relief to which he was not entitled. Instead, Huber should be afforded the opportunity to prove his claim; if successful, his recovery should then be limited to the proper amount. *Rosenwald v. Goldfein*, 3 A.D.2d 206, 209–10, 159 N.Y. S.2d 333, 337 (1st Dep't 1957) (per curiam).

Our recent decision in *Lehman v. Dow Jones* makes clear the availability of an independent action for fraud based upon an unfulfilled fraudulent promise to pay a finder's fee. On facts strikingly similar to those presented here, Judge Friendly, writing for the panel, noted that under New York law, "the plaintiff in a fraud action predicated on a promise made with no intent to perform may nonetheless 'recover the direct pecuniary loss, if any, suffered by reason of the wrong.'" *Lehman v. Dow Jones*, at 295 (quoting *Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888, 889, 193 N.Y.S.2d 859, 860 (1st Dep't 1959)). Here, Huber "does not claim that the 'fraud' consisted of [Fort Howard's and Maryland Cup's] failure to honor the alleged oral promise; rather, he claims that the 'fraud' consisted of [Fort Howard's and Maryland Cup's] explicit and implicit representations that [they] intended to pay him for his services when at the time [they] in fact did not." *Lehman v. Dow Jones*, at 295. And "New York law is clear that an action for fraud will lie when a defendant makes a promise that he has no present intention of performing." *Id.* (citing *Songbird Jet Ltd. v. Amax Inc.*, 581 F.Supp. 912, 924 & n. 39 (S.D.N.Y.1984), *aff'd mem.*, 779 F.2d 39 (2d Cir.1985); *Channel Master*, 4 N.Y.2d at 406–07, 176 N.Y.S.2d at 262–63, 151 N.E.2d 833).[7]

In short, we find that Judge Keenan improperly dismissed Huber's legally distinct fraud claims. In so holding, we perceive no erosion in the viability of the Statute of Frauds defense in contract actions. By affording claimants the opportunity to assert fraud claims premised upon oral promises of remuneration, we do not more than curb the Statute of Fraud's use as a shield for wrongdoers. *See Imperator Realty Co. v. Tull*, 228 N.Y. 447, 457, 127 N.E.2d 263 (1920) (Cardozo, J. concurring). We do so, however, with a full appreciation of the careful balance that must be struck if the legislative intent underlying the Statute of Frauds is not to be subverted. *See Daystrom*, 30 A.D.2d at 519, 290 N.Y.S.2d at 206. By restricting a fraud claimant solely to an out-of-pocket recovery, along

---

7. Ultimately, the *Lehman* panel affirmed dismissal of plaintiff's fraud claim for failure to establish the required element of injury. Judge Friendly concluded that the plaintiff had suffered no pecuniary loss stemming from the fraud itself since the services provided to effectuate a merger, e.g., tracking and analyzing the prospective acquired company, were those which were plaintiff's very business. Critical to that conclusion was the fact that the plaintiff in *Lehman* had performed these services and made available their product to a number of prospective acquiring companies in the hope of stimulating an eventual merger. *See* at 296, 297 n. 12. The present case clearly falls within the holding of *Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 411 N.Y.S.2d 669 (2d Dep't 1978), which Judge Friendly found distinguishable from *Lehman*. In *Shapiro*, there was no indication that the finder provided the acquired company's name to any of his other clients; "therefore, it was entirely reasonable to assume that he gave up whatever fee he might have gotten from one of them in reliance on getting a fee from the defendant." *Lehman*, at 296 n. 12. The same is true here. Moreover, like the plaintiff in *Shapiro*, but unlike the plaintiff in *Lehman*, Huber has alleged substantial efforts on behalf of Fort Howard and Maryland Cup toward consummation of the merger.

with any punitive damage award a jury may assess, it is possible to return the claimant to the same position he occupied before the fraud was committed without facing the attendant risk of indirectly enforcing a contract otherwise barred by the Statute of Frauds. *See generally* Note, *supra,* at 1248 ("[B]ecause an out of pocket recovery is practically and theoretically different from that obtained by enforcement of the contract, permitting the fraud action does not defeat the policy underlying the Statute of Frauds." (footnotes omitted)).

The preceding discussion assumes application of New York law to the fraud claims. Judge Keenan concluded that under either a *lex loci delicti* or governmental interest analysis, New York's law must apply. The traditional *lex loci* doctrine requires application of the law of the place where the plaintiff's injury occurred. *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 196, 491 N.Y.S.2d 90, 93–94, 480 N.E.2d 679 (1985). Virtually all of Huber's alleged injury was sustained in New York. Under a governmental interest analysis, New York's interest, which stems from its concern with the transaction underlying this lawsuit, is paramount to that of either Wisconsin or Massachusetts. Because a benefit of the bargain measure of damages for fraud might engender circumvention of the Statute of Frauds, New York's limited damages rule expresses the significant interest applicable to the fraud claim. Indeed, our decision recognizes the availability of a fraud claim only to the extent that such a claim does not conflict with the Statute of Fraud's proscriptions.

Huber contends that New York law should not apply, arguing that *"Daystrom* interest ... is surely not so omnivorous that it swallows up claims based on independent fraudulent representations...." In particular, he argues that in *Daystrom,* the fraudulent promise was identical to the contractual promise, while here, the promises are wholly independent.

We disagree. First, Bank's promise that Maryland Cup would pay Huber's fee if Fort Howard did not must be viewed as fundamentally identical to the original contractual promise upon which Huber sued, since it too embodied an agreement to pay a finder's fee in the event of a successful merger.[8] Alternatively, such a promise may also be characterized in the nature of a surety agreement, which also must be supported by a writing. *See* N.Y.Gen. Oblig.Law § 5–701(a)(2) (McKinney Supp. 1986) (barring oral promises "to answer for the debt, default or miscarriage of another person"); *Martin Roofing, Inc. v. Goldstein,* 60 N.Y.2d 262, 264–67, 469 N.Y.S.2d 595, 596–98, 457 N.E.2d 700 (1983), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1681, 80 L.Ed.2d 156 (1984). Likewise, Schierl's reassurance that Fort Howard would pay Huber's fee cannot be characterized as independent of the original contractual promise; indeed, it can only be construed as a reiteration of the precise promise sued upon. Since allowing benefit of the bargain damages for claims of this nature would directly circumvent the Statute of Frauds, New York's interest in having its fraud law apply is evident. Finally, Schierl's statements to Huber that he could not issue a fee letter and that Huber did not need one, are sufficiently intertwined with the original contractual promise so as to implicate New York's interest.

## III. CONCLUSION

To summarize: We affirm the district court's decision denying Huber's motion to stay, transfer or dismiss the declaratory judgment action. We also affirm the district court's decision insofar as it applied New York law to the contract claims and found those claims to be barred by the Statute of Frauds; we reverse the district court's dismissal of the fraud claims. On remand, the district court should evaluate the reinstated fraud claims subject to the

---

**8.** Indeed, paragraph 61 of Huber's Amended Answer and Counterclaims set forth that he and Maryland Cup, through Merrill Bank, had an *agreement* concerning the payment of a finder's fee.

limited damages to which Huber would be entitled under New York law.[9]

---

**9.** Although New York's out-of-pocket rule limits the damages recoverable by a fraud plaintiff to actual pecuniary loss, *Reno v. Bull,* 226 N.Y. 546, 552–53, 124 N.E.2d 144 (1919), and excludes all elements of profit, *id.,* we note, but do not decide, the possibility of a recovery for a foregone opportunity. In distinguishing *Lehman* from *Shapiro,* Judge Friendly assumed an element of the *Shapiro* plaintiff's damages to include "whatever fee he might have gotten from other [clients which was given up] in reliance on getting a fee from the defendant."

*Lehman,* at 296 n. 12. *Cf. Cayuga Harvester, Inc. v. Allis-Chalmers Corp.,* 95 A.D.2d 5, 22–24, 465 N.Y.S.2d 606, 618–19 (4th Dep't 1983) (allowing recovery for value of destroyed corn crop stemming from defective harvesting machine defendants fraudulently induced plaintiff to purchase; "But for plaintiff's decision to buy defendants' machine in reliance on their misrepresentations, instead of some other machine which would have worked properly, ... plaintiff's corn crop would not have been lost.").