Joseph J. KAPPEL and Gamma
Investment Corporation,
Plaintiffs,

v.

William T. COMFORT, Richard E. May-
berry, Jr., Kilin To, David F. Thomas,
Peter E. Gerry and John R. Whitman,
Defendants.

95 Civ. 2121 (MBM).

United States District Court,
S.D. New York.

Feb. 15, 1996.

Donald J. Balsley, Jr., Pittsburgh, PA, for
Plaintiffs.

Peter A. Bellacosa, Kirkland & Ellis, New
York City, for Defendants.

Chaim T. Kiffel, Kirkland & Ellis, Chicago,
IL.

OPINION AND ORDER

MUKASEY, District Judge.

Defendants have moved to stay this action pending resumption or conclusion of related litigation in Pennsylvania, and defendant John R. Whitman has moved pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss for failure to serve process in accordance with Fed. R.Civ.P. 4(e) and N.Y.Civ.Prac.L. & R. 308(2). For the reasons and to the extent set forth below, both motions are granted.

I.

The complaint in this case alleges that the defendants, as employees of Citibank Venture Capital Ltd. ("CVC"), agreed in 1991 to sell to plaintiff Kappel, apparently acting on behalf of plaintiff Gamma Investment Corporation, certain stock, principally Class B common stock, in an entity called Vectura Group Inc. that operated as a holding company. Kappel alleges he is a resident of McKees Rocks Pennsylvania; Gamma is said to reside at the same address as Kappel. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. The complaint asserts that Kappel, through another entity he controlled called NBL, offered in December 1990 to buy this stock from defendants and from CVC and David Wagstaff III for $24 million. Neither CVC nor Wagstaff is named as a defendant.

The complaint alleges that Kappel then arranged financing from US West Financial Corporation in Kansas City and obtained from US West in December 1990 a commitment to finance the purchase of Vectura Class B common stock. Oddly, the complaint alleges that Kappel was acting on or before December 1990 "in reliance on defendants['] intent to sell their Vectura stock interests" (Cmplt. ¶ 16), although it is not alleged that any defendant had made a commitment earlier than January 10, 1991 to sell the stock. On that date it is alleged that defendant Richard E. Mayberry, Jr., a CVC vice presi-

dent, signed a letter of commitment to sell the stock.

In any event, the complaint then alleges that Kappel, in reliance on the commitment to sell Vectura Class B common stock, arranged with certain unspecified persons to buy Vectura Class A and B preferred stock when NBL bought that stock from CVC and Wagstaff. The complaint alleges that NBL, which is not a party to this action, acting in reliance on the defendants' acceptance of Kappel's offer to purchase the Class B common stock, itself bought from defendants class A and B preferred stock and then sold that stock to various purchasers in March 1991 at a "discount" of $276,000. (Cmplt. ¶ 21)

The complaint alleges further that Kappel executed unspecified "documents" with US West Financial on April 8, 1991 (Cmplt. ¶ 23), but that he was told on April 9 by defendant Mayberry and by Wagstaff, who is not a defendant, that defendant William T. Comfort had changed his mind. (Cmplt. ¶ 24) In late April 1991, Kappel allegedly was told by Comfort in the presence of other defendants that the deal would not go through because the defendants' Vectura stock was worth more than they had agreed to sell it for. (Cmplt. ¶ 27) Plaintiffs claim that as a result they suffered an unspecified "severe economic loss." (Cmplt. ¶ 28)

In its final paragraphs, the complaint alleges that Vectura management shareholders, presumably including some of the defendants, reaped benefits in 1992 based on a valuation of Vectura at up to $47 million, and that Vectura in October 1992 controlled assets worth upward of $62 million. (Cmplt. ¶¶ 29, 30)

These factual allegations are said to give rise to a claim for breach of contract in the amount of $20 million, and a claim for fraud in the amount of $20 million. How plaintiffs suffered identical fraud and contract damages is not explained, nor is it explained how plaintiffs could have suffered any fraud damages at all beyond Kappel's carfare to and from US West in April 1991, which was the only act he took after receiving any alleged commitment to buy stock, or how NBL could have been acting in reliance on defendants'

commitment to sell one class of stock by buying and then selling at a loss another class of stock, or why that is at all relevant when one considers that NBL is not a party to this litigation.

This complaint sounds like the second reel of a movie; the first reel apparently was shown in Pennsylvania before the current complaint was filed here. According to the affidavits of Mayberry, sworn to July 30, 1993, and of defense counsel Peter A. Bellacosa, Esq., sworn to September 11, 1995, which plaintiffs have disputed only in irrelevant particulars, the plot in the first reel unfolds something like this: In January 1991 Kappel was president of Vectura. He then offered to buy the investment of defendants and of CVC and Wagstaff in Vectura. The deal was supposed to close by March 31, 1991, but failed to do so when Kappel failed to provide timely financing. (Mayberry Aff. ¶¶ 2–5)

In December 1992 Vectura discovered that Kappel had allegedly defrauded the company of millions of dollars in cash and other assets. Kappel was forced to resign and the company in March 1993 filed a complaint against Kappel and others in the U.S. District Court for the Western District of Pennsylvania (the "Vectura case"). (Mayberry Aff. ¶ 8, Ex. D)

In June 1993, Kappel and Gamma, plaintiffs here, filed an action in the state courts of Pennsylvania against CVC, Wagstaff and the defendants named in the current complaint in this court, alleging, as they do here, breach of contract to sell Vectura stock, and fraud ("plaintiffs' Pennsylvania case"). The complaint in plaintiffs' Pennsylvania case and in the case at bar read virtually word for word in their factual allegations. Defendants in plaintiffs' Pennsylvania case removed that action to the U.S. District Court for the Western District of Pennsylvania. In October 1993 that Court dismissed for lack of jurisdiction both claims against the defendants now sued in this court, and dismissed the fraud claim as to all defendants. (Bellacosa Aff. ¶¶ 3–7)

In December 1993, the government filed civil forfeiture complaints against Kappel and Gamma in the Western District of Pennsyl-

vania (the "government cases"), based in part on the alleged Vectura fraud that was already the subject of the Vectura case. In addition, Kappel was informed by the United States Attorney for that District that he was the target of a criminal investigation. (Bellacosa Aff. ¶ 9)

Plaintiffs' Pennsylvania case was allowed to languish until the spring of 1994, when discovery was briefly revived, but plaintiffs failed to provide discovery. Eventually, the Vectura case and the government cases were consolidated, and those consolidated cases and plaintiffs' Pennsylvania case, all pending in the same Court, were stayed, apparently to permit a global resolution of the issues underlying all the cases. Such issues include (i) the actual value of Vectura at the time CVC and the defendants in the case at bar allegedly agreed to sell Vectura stock to Kappel, and (ii) whether and by how much Kappel's alleged frauds diminished the value of Vectura before, at and after the time he tried to buy Vectura stock. Although plaintiffs here initially opposed such a stay, the latest such stay, including a stay of their Pennsylvania action against CVC and Wagstaff, was put in place at their suggestion. (Bellacosa Aff. ¶¶ 8, 10–35)

## II.

Defendants in the case at bar, who were dismissed from plaintiffs' Pennsylvania action for lack of personal jurisdiction, have moved for a stay, noting the relatedness of this case to the various actions pending in the Western District of Pennsylvania, and the possible impact on those cases of rulings made and discovery conducted here. In particular, they have noted that central to the pending actions in Pennsylvania and to the claims here is the issue of how much Vectura was worth at the time plaintiffs allege defendants agreed to sell Vectura stock to them, and the closely related issue of whether Kappel was the victim of a breach of contract and a fraud, as he contends, or the perpetrator of a fraud, as Vectura and the government have contended in Pennsylvania. Plaintiffs have simply brushed aside these concerns, proclaimed themselves eager to proceed in this jurisdiction, and suggested that the district

court for Western District of Pennsylvania should transfer their action against CVC and Wagstaff to New York.

 When deciding whether to grant a stay like the one sought here, which courts may issue pursuant to their inherent power to regulate their dockets, courts consider five factors, summarized as follows by Judge Conner:

(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. [citation of cases omitted]

Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice.

*Volmar Distributors v. New York Post Co.,* 152 F.R.D. 36, 39 (S.D.N.Y.1993).

(1) —The desultory history of the various actions in Pennsylvania, including plaintiffs' Pennsylvania action against CVC and Wagstaff, shows that despite their professed eagerness to proceed here, plaintiffs have shown little apparent inclination to seek an early and comprehensive resolution of the issues underlying the case at bar. They will suffer little prejudice from a stay that matches the one in place in Pennsylvania because without progress toward resolution of the issues underlying those actions, this case cannot be conclusively resolved.

(2) —The individual defendants would be considerably burdened by undertaking motion practice and discovery here, knowing that they might well have to provide discovery as third parties in connection with the Pennsylvania actions should those not be resolved without further active litigation. Orders coordinating the discovery in the two cases cannot be put in place so long as the actions in Pennsylvania are stayed.

(3), (4) and (5)—To be sure, this court is obligated to exercise its jurisdiction over cases before it, and to guide those cases toward as speedy and inexpensive a conclusion as is consistent with permitting claims to

be heard fairly. See Fed.R.Civ.P. 1 (rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action"). However, there is also the obligation to assure that this court's exercise of its jurisdiction does not have an avoidably harmful impact on cases already pending before another court. *Cf. Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir. 1991); *Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 790 (2d Cir.1986) (absent special circumstances, the first filed of two competing lawsuits should have priority). That obligation weighs in favor of a stay here, at least so long as the related civil cases in the Western District of Pennsylvania remain stayed based on that Court's judgment that a stay will permit the parties to resolve their disputes economically and fairly.

### III.

As noted, defendant John R. Whitman has moved pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss for improper service of process. He avers that although N.Y.Civ.Prac.L. & R. 308(2), applicable through Fed.R.Civ.P. 4(e), requires that the summons and complaint be left at his actual place of business, they were left at CVC, which is not his actual place of business. Plaintiffs have not disputed that claim. Accordingly, Whitman's motion to dismiss is granted without prejudice to effecting proper service upon Whitman.

\* \* \*

For the foregoing reasons, the motion to stay this action is granted pending further order of the court, except that plaintiffs may effect service upon Whitman, whose motion to dismiss is granted without prejudice to plaintiffs' right to effect proper service.

SO ORDERED.