**Francis E. LIJOI, Plaintiff,**

v.

**CONTINENTAL CASUALTY CO. and Forbes, Inc., Defendants.**

No. 01–CV–4536 (ILG).

United States District Court, E.D. New York.

Feb. 13, 2006.

---

Evan S. Schwartz, William J. O'Mahony, Michail Z. Hack, Quadrino & Schwartz, Garden City, NY, for the Plaintiff.

Patricia Marie McIntire, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for the Defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

Since September 1996, Plaintiff Francis E. Lijoi has been totally disabled. He has continually provided evidence of his increasingly disabled condition to an insurance company that, after awarding him total disability benefits from December 1996 until August 1998, arbitrarily reversed its determination. For more than seven years, Continental has ignored the mounting evidence of Lijoi's disability, choosing to litigate its denial of his bene-

fits rather than accept the plain fact that he is unable to work.

Francis E. Lijoi, ("Plaintiff" or "Lijoi") brings this action against Continental Casualty Company ("Continental" or "defendant") and Forbes, Inc. ("Forbes") to enforce provisions of his long term disability insurance plan under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(2). He claims that his long-term disability benefits were improperly terminated on the basis of a determination made by Continental, which acted without an express delegation of authority over his claim, and that Forbes breached its fiduciary duty by allowing Continental, a conflicted insurance company, to make the claims decision.[1] Continental has moved for "judgment on the administrative record," fashioning its motion as arising pursuant to *Fed. R. Civ. Proc. 12(c)*. Plaintiff has cross-moved for judgment under *Fed. R. Civ. Proc. 56*. For the reasons stated below, defendant's motion is converted to a motion for summary judgment and denied, and plaintiff's cross-motion for summary judgment is granted.

### BACKGROUND

#### I. Lijoi's Medical Condition

Lijoi was Director of Technical Services for Forbes, Inc. through September 1996. In that capacity, he managed technical aspects of all information technology projects for Forbes, particularly regarding networking file/print services and new technologies. (*Aff. in Supp. of Continental Casualty Co.'s Mot. for J. on the Admin. R.*, Ex. B, claims file ("CLM"), 248–49). He worked an average of forty to fifty

---

1. The motions before the Court involve only the claims brought against defendant Continental.

hours per week in an office environment. (*Id.*).

Beginning in August 1996, Lijoi began to experience unexplained episodes of dizziness and fatigue and was evaluated by Dr. Samuel Cho and Dr. Peter Pasternack, neurologists at NYU Medical Center. (*CLM* 343, 352). On September 19, 1996, Lijoi lost consciousness while driving, and was in a serious automobile accident when his car went out of control and impacted a metal pillar. (*CLM* 312). He was brought by ambulance to Coney Island Hospital where he was admitted overnight and treated for syncope, possible herniated lumbar, cervical disc with radiculopathy and post-concussion syndrome. (*CLM* 301). On September 20, 1996, Lijoi signed out of Coney Island Hospital against medical advice to see his neurologist, Dr. Pasternack, at NYU (*Id.*). On September 22, 1996, Lijoi was admitted to NYU Medical Center where he underwent numerous diagnostic tests. (*CLM* 380–402). The tests did not result in a clear diagnosis, but on October 2, 1996, Lijoi underwent surgery in which his cardiologist, Dr. Gupta, implanted a pacemaker to counteract the effects of the irregularly slow heartbeat believed to have contributed to his fainting episodes and accident. (*CLM* 390). After being released from NYU, Lijoi still complained of severe symptoms, including sleeplessness; back, hip, neck, groin, and chest pain; headaches; numbness in arms, legs, hands and feet; an inability to walk, depression, dizziness, nervousness, forgetfulness, and impairments of concentration and comprehension. (*CLM* 355).

From November 1996, and for almost the next two years, plaintiff's primary treating physician was a neurologist, Dr. Head, who treated him for what Dr. Head believed to be lingering neurological effects of the September 1996 car accident.[2] In his initial consultation, on November 19, 1996, Dr. Head diagnosed cervical and lumbar strain, possible cervical and lumbar radiculopathy, possible herniated cervical and lumbar discs, post-traumatic headaches, and post-traumatic anxiety and depression. (*CLM* 259). On Dr. Head's recommendation, a CAT scan was conducted on December 27, which indicated a herniated disc at C4–5. (*CLM* 267).

Lijoi began physical therapy on January 7, 1997, where he continued to complain of pain, anxiety, and depression. (*CLM* 262). He was "restricted in the treatment ... due to the level of his subjective complaints," and treatment goals were established to reduce pain and increase flexibility. (*CLM* 263–264).

No later than June 23, 1997, and continuing throughout his treatment of Lijoi, Dr. Head repeatedly certified that Lijoi was totally disabled, unable to return to work, and that it was undetermined when he would be able to return. (*CLM* 38, 63, 111, 159, 198, 209, 219, 235). On November 11, 1997, Dr. Head stated that he believed Lijoi would be unable to return to work in the future, that there were no job accommodation that would allow him to return to work, and that it was undetermined when Lijoi would reach his maximum medical improvement. (*CLM* 209). In the November 11, 1997 report, Dr. Head indicated that Lijoi was receiving "conservative treatment," including pain medication and swimming therapy, and that because of the disc herniation, persistent complaints of pain, and the side effects from his medications, Lijoi was unable to resume working. (*Id.*). By January 10, 1998, with Lijoi reporting a worsening of the previous conditions

---

**2.** Lijoi was informed when he called Dr. Pasternack's office on October 14, 1996 that the doctor had passed away unexpectedly. (*CLM* 258). Lijoi was referred to Dr. Head by a friend.

and additional discoloration, pain, and numbness in arms and hands, Dr. Head believed that Lijoi was not a suitable candidate for rehabilitation services because "his numerous severe medical problems preclude work activity." (*CLM* 198). Lijoi continued to attend physical therapy. (*Id.*).

On July 21, 1998, Lijoi was seen by Continental's neurologist, Dr. Neophytides, in an effort by Continental to confirm the findings and diagnoses made by Dr. Head. (*CLM* 65–69). Dr. Neophytides observed that Lijoi claimed a number of symptoms, including "[n]eck pains, radiating to both upper extremities; numbness in the upper extremities ... pain in the lumbar spine ... spasms ... headaches; depression; poor sleep; occasional wetting of the bed; loss of sexual drive ... [and] generalized weakness, which causes him to collapse intermittently and to fall." (*CLM* 65). After conducting a neurological evaluation, however, Dr. Neophytides found "no definite evidence of any neurological dysfunction to account for [Lijoi's] symptoms." (*CLM* 67). He expressed skepticism as to plaintiff's assertions of disability, finding that Lijoi's "active range of motion in all four limbs was limited, but in a pattern consistent with the patient's refusal to allow for range of motion movements, due to claimed pain," and concluded that Lijoi "did not have any significant degree of neurological disability. He should be able to work in his prior capacity." (*Id.*).

In 1998, Lijoi was first tested for and diagnosed with Hepatitis C and Chronic Fatigue Syndrome. (*CLM* 42–48, 55–56, 58). On September 2, 1998, a biopsy was performed under the direction of Dr. Terzuoli, a gastroenterology specialist and internal medicine practitioner at Staten Island Hospital, and the results showed Lijoi had chronic active Hepatitis, grade 2, with bridging fibrosis, stage 3. (*CLM* 56). Dr.

Terzuoli diagnosed him on September 16, 1998, and he received follow up care from Dr. Jane M. Geders, a faculty practitioner associated with the New York Methodist Hospital. (*CLM* 42–45). Additionally, a related diagnosis made in October, 1998 demonstrated that Lijoi had progressive Dupuytren's disease of his hands which required surgery. (*CLM* 40). On October 21, Dr. Head, reviewing these diagnoses, reiterated his finding of disability and noted the "worsening of the Dupuytren's Contractures," and that the Hepatitis diagnosis "further complicate[s] the clinical picture." (*CLM* 38).

## II. Continental's Termination of Long Term Disability Benefits

On December 20, 1996, Lijoi applied for long term disability benefits from Continental. (*CLM* 435). His claim arose under the "Own Occupation" category of the policy, which defines "disability":

*"Disability"* means that during the *Elimination Period* and the following 36 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and

2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(*Aff. in Supp. of Continental Casualty Co.'s Mot. for J. on the Admin. R.*, Ex. B, Forbes Long Term Disability Plan, ("Plan"), at 5 (emphasized words defined elsewhere by the Plan)).

As proof of the disability, the Plan specifies a number of items which must be supplied at the claimant's expense, stating that "[f]ailure to do so may delay, suspend or terminate ... benefits." (*Plan* 11). The Plan requires the claimant to provide, *inter alia:*

4. Proof that *You* are receiving *Appropriate and Regular Care* for *Your* condition from a *Doctor* ... whose specialty or expertise is the most appropriate for *Your* disabling condition(s) according to *Generally Accepted Medical Practice*

5. Objective medical findings which support *Your Disability*. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s)

6. The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

(*Plan* 12).

Continental acknowledged receipt of Lijoi's claim on December 30, 1996, and began collecting medical records from his treating physicians. (*CLM* 418). On February 6, 1997, Continental approved long term disability benefits for Lijoi, *"pending receipt of additional medical evidence from Dr. Head supporting ongoing disability."* (*CLM* 278 (emphasis in original)). The elimination period was deemed to have ended on December 16, 1996, and based on Lijoi's salary, he was awarded the maximum benefit of $5000 per month. (*CLM* 278–79). Over the next year and a half, Continental continued to investigate plaintiff's claim, receiving additional information from plaintiff's doctor and further evaluations of plaintiff's medical condition as described above.

Beginning in early 1998, Continental personnel began to express skepticism of plaintiff's injuries. In February 1998, the disability specialist assigned to Lijoi's case described his medical condition as "vague," and another analyst expressed a desire to review the claim "due to the focus on managing theses [sic] high reserve claims." (*CLM* 202).[3] A Continental nurse who reviewed Lijoi's file noted that there was "not a great deal of objective information since the initial auto accident and hospitalization for pacemaker," and recommended a functional capacity examination (FCE) to determine the physical demand level of Lijoi's occupation, his work capacity, and ability to return to the same occupation based on his asserted disability. (*CLM* 200–201). In response to Continental's concerns, Lijoi submitted a detailed vocational evaluation conducted at the request of his attorney. The report evaluated Lijoi's abilities and limitations against a broad range of vocational possibilities, and concluded that the survey "failed to reveal even one occupation that Mr. Lijoi could perform." (*CLM* 147–152). Continental nonetheless insisted on conducting its own FCE, which was warranted by the terms of the policy. (*Plan* 12). Based on the results of that FCE, another Continental analyst observed that "the conditions diagnosed do not appear to be supported with objective information," and recommended an independent medical examination to address the "subjective complaints" of Lijoi. (*CLM* 113).

Following the FCE, Continental arranged for a medical examination of Lijoi by Dr. Neophytides on July 21, 1998, the results of which are discussed *supra* in Section I. This examination by Continental's own physician was also warranted by the terms of the policy.

On August 11, 1998, in a letter sent to Lijoi, Continental informed plaintiff that it had determined that his condition had improved and that there was no current evidence or sufficient proof of the existence of any disabling restrictions or limitations

---

3. "High reserve" refers to the fact that Lijoi was making $108,000 annually at the time he became disabled and was collecting the maximum allowed benefit under the plan, $5000 per month.

that would qualify him for continued disability benefits under the terms of the plan. (*CLM* 61–62). The decision cited the opinion issued by Continental's neurologist based on his single evaluation of Lijoi, the FCE that Continental had commissioned, and the opinion of Lijoi's cardiologist that his cardiac condition was stable to undergo the stress of the FCE. It made no specific reference to Lijoi's continual symptomatic complaints, the multiple reports of Lijoi's treating neurologist, Dr. Head, or the vocational assessment conducted by Lijoi's consultant, but nonetheless concluded that "[b]ased upon a review of all the documentation contained in your file at this time, it is noted that your condition has improved, and there is no current evidence supporting a position that you would be physically impaired to a degree that would prevent you from returning to [your job]." (*Id.*). The letter notified Lijoi that he had 60 days in which to appeal, by submitting "an explicit written explanation of your reasons for disagreeing with this decision," and "compelling evidence you fell [sic] will alter our decision. This usually includes objective medical information relevant to the issues and time period surrounding your claim." (*Id.*).

On August 25, 1998, Lijoi, by counsel, notified Continental that he disputed, and would be appealing its determination. He also informed the administrator of his recent diagnoses of Hepatitis C and Chronic Fatigue Syndrome, and promised supporting documentation. (*CLM* 58). On September 18, 1998, plaintiff submitted supporting documentation of his recent medical evaluations, including a Staten Island University Hospital report showing a diagnosis of Hepatitis C; various prescription records concerning his treatment for Hepatitis C, including one from a faculty practitioner at New York Methodist Hospital; several reports from Dr. Head confirming that the diagnosis of Hepatitis C complicated Lijoi's medical condition; and various medical reports from previously unidentified physicians, confirming additional related diagnoses of tinnitus, post-concussional syndrome, and Dupuytren's disease. (CLM 38–48, 54).

Continental issued an appeal letter affirming the August decision to terminate Lijoi's benefits on December 8, 1998. (*CLM* 31–33). That letter reiterated the findings of the August 1998 decision, and for the first time explicitly addressed the fact that "Dr. William Head continually submits physician's statements that indicate your client is unable to return to his own occupation." Continental discredited those statements, however, noting that

[Dr. Head] has not included any clinical findings. On July 21, 1997 the form indicated [Lijoi] had "possible herniated lumbar and cervical disc with radiculopathy, possible traumatic headaches and anxiety depression." As of November 7, 1997 Dr. Head indicated [Lijoi] was receiving conservative treatment which included Flexeril, Naprosyn and Vicodin and was undergoing swimming therapy. He stated there were severe restrictions of cervical movements in addition to his serious cardiac condition. Dr. Head stated your client was unable to return to work at that time due to side effects from medication. The results of a CAT scan indicated your client had a disc herniation at C4–5.

[Another statement from Dr. Head] indicated that [Lijoi] was still being treated for herniated cervical disc, possible early Parkinson's disease, cardiac disease, syncope, etc. [Dr. Head] stated [Lijoi] was unable to return to work due to his numerous severe conditions however Dr. Head did not submit any objective findings that would substantiate these findings.

(*CLM* 32). The letter also discredited the vocational assessment commissioned by Li-

joi, concluding that the assessment did not provide any "objective findings."

In contrast, the letter reiterated its acceptance of Dr. Neophytides's findings, including that he "could find no definite evidence of any neurological dysfunction to account for [Lijoi's] symptoms," that "[a]lthough [Lijoi] may have a small cervical herniated disk [sic], this would not cause any neurological deficit" and that "[the herniate disc] may only account for some mild, chronic neck pain," and that Lijoi "should be able to work in his prior capacity where brief periods of rest may be needed intermittently." (Id.). The letter also credited the FCE commissioned by Continental, stating that though Lijoi "performed poorly on the [FCE] test ... it was determined that he is capable of lifting up to 10 pounds occasionally and returning to his sedentary occupation." (Id.).

With respect to the new diagnoses of which Lijoi had submitted evidence, the appeals letter was dismissive. It stated, in sum, that "[w]e have also reviewed the additional report [that] indicated [Lijoi] has chronic active Hepatitis C. This is being treated with therapy, Interferon and Ribavirin. There are no objective findings along with this diagnosis that would preclude him from returning to his own occupation." (CLM 33). Similarly, the letter dismissed the diagnoses of tinnitus, post-concussional syndrome, and Dupuytren's disease, advising Lijoi that "verification a medical condition exists does not confirm an individual's inability to perform the duties of his/her occupation nor does it prove any disabling impairment. You may experience some problems associated with your condition, however the medical evidence fails to substantiate a condition of such severity as to prevent you from returning to work." (Id.).

Immediately after receiving notice that Continental had affirmed its decision to terminate his benefits, plaintiff, by counsel,

contacted Continental on December 11, 1998 to inquire whether the appeal could be reconsidered in light of the new Hepatitis diagnosis and the understanding that the previously undiagnosed Hepatitis had contributed to his disabled condition. (CLM 29). The file notes show that the Continental employee who responded to that phone call indicated to counsel that "we have already completed our ERISA req [sic] but would look at addl info [sic] that may have been missing from the file but there is no time limit for our review." (Id.). At least one additional letter was submitted by plaintiff, from Dr. Jane Geders, Chief of the Division of Gastroenterology & Hepatology at New York Methodist Hospital, which stated that Lijoi "has been under [her] care since October 12, 1998," that he has been diagnosed with "chronic viral Hepatitis C," that he is receiving treatment, and that "[a]s a results [sic] of this therapy the patient is suffering from *significant* side effects, including "Flu-like" symptoms, headaches, *profound* fatigue, myalgias, and arthralgias. He is also experiencing adverse psychiatric effects including anxiety, depression and memory loss." (CLM 18 (emphasis in original)). Continental responded to that letter by sending plaintiff a copy of the December 8 appeal determination, and stating that "[t]he additional medical information ... does not alter the Company's decision of December 8, 1998. You have exhausted all administrative remedies offered by the appeals process. The decision of December 8, 1998 is final and binding." (CLM 16).

## DISCUSSION

### I. Conversion of Plaintiff's Rule 12(c) Motion

Defendants have moved for a "judgment on the administrative record," and stylized it pursuant to *Fed.R.Civ.P.* 12(c). A motion for "judgment on the administrative

record" is not a motion specifically authorized by the Federal Rules of Civil Procedure. Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Where, as here, "materials outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Fed. R.Civ.P.* 12(c).

■ Defendant's citation to *Muller v. First Unum Life Insurance Co.*, 341 F.3d 119 (2d Cir.2003) is unenlightening. The Second Circuit confronted a contorted posture in that case where, following its denial of summary judgment on a rejection of ERISA benefits claim, the district court conducted a "de novo review of the parties submissions" and granted the plan administrator's "judgment on the administrative record." *Id.* at 123. Noting the unclear posture of the case, the Circuit construed the district court's judgment as an improperly supported "bench trial on the papers," and remanded the case for the court to make findings in accordance with Rule 52, "as [the Circuit has] done in other ERISA cases where the lack of adequate findings precluded effective review." *Id.* at 125. Nowhere in that opinion is it contemplated that a court reviewing an ERISA determination properly disposes of the matter on the pleadings pursuant to Rule 12(c); such a procedure would render meaningless this Court's obligation to review the record by confining the Court to the unsupplemented pleadings. If anything, *Muller* emphasizes the importance of this Court's strict adherence to the Federal Rules of Civil Proce-

dure: When extrinsic evidence is submitted along with a Rule 12(c) motion, the Court may either refuse to consider that evidence and limit itself to the pleadings, deny it and proceed towards trial, or consider the motion as arising under Rule 56. *Id.* at 124–125.

Both parties in this case have had ample opportunity to contemplate that this motion might be considered under Rule 56 and acknowledge the sufficiency of the evidence presented as a basis for this Court's determination on the merits. It should come as no surprise that this Court, recognizing the importance of the evidentiary submissions before it, considers the motion and cross motion as motions for summary judgment. *See, e.g., In re G. & A. Books*, 770 F.2d 288 (2d Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986) (essential inquiry in *sua sponte* conversion of a Rule 12 motion to dismiss into a Rule 56 motion for summary judgment is "whether the [parties] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or [were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.").

## II. Standard of Review

■ A denial of benefits under ERISA is reviewed by the District Court "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The parties do not dispute that Continental lacked such discretionary authority by the terms of the plan prior to January 1, 1999.[4]

---

4. Plaintiff disputes the validity of the January 1, 1999 amendment granting discretion to Continental to review claims. Because the

Court finds that Continental's determination became final in December, 1998, it expresses

Defendant contends, however, that it was granted discretionary authority by amendment of the plan as of January 1, 1999, that plaintiff's final appeal was reconsidered in January 1999, and that a letter written in February 1999 should be considered as evidence of a second appeal determination, under Continental's newly granted discretion. On that basis, defendant asserts that its determination is reviewable only under the deferential "arbitrary and capricious" standard. *See, e.g., Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441–442 (2d Cir.1995) (applying "arbitrary and capricious" standard of review where administrator was granted discretion to determine claims); *Smathers v. Multi–Tool, Inc.,* 298 F.3d 191, 194–197 (3d Cir.2002) (where procedural amendment to plan grants discretion to administrator to determine claims, standard of review should be determined by the plan in effect at the time of final denial rather than the time of the claim). This argument is unpersuasive. Though Continental asserts that it reopened Lijoi's case in 1999 to afford him a second appeal, there is simply no evidence that it took such action. While it is clear that plaintiff *sought* additional review of his file and submitted additional medical records in January 1999, no additional findings were made by Continental as a result of plaintiff's efforts, and the plain language of the January 22, 1999 and February 1, 1999 letters from Continental to the plaintiff establishes that the case was neither reopened nor reconsidered after the December 1998 appeal decision. (*See* CLM 15 ("Mr. Lijoi's appeal had been completed on December 8, 1998 and his administrative record was closed at that time ... Should Mr. Lijoi remain in disagreement with CNA's decision ... he may wish to pursue his legal options."); CLM 16 ("The additional medical information submitted with your correspondence does not alter the Company's decision of December 8, 1998. You have exhausted all administrative remedies offered by the appeals process. The decision of December 8, 1998 is final and binding.")). As a result, the Court engages in a *de novo* review of all aspects of the determination.[5]

▮ In applying the *de novo* standard, this Court reviews "all aspects of the denial of [the claim], including fact issues," *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 245 (2d Cir.1999), "to determine for itself whether the claimant should be granted or denied the requested relief." *Elsroth v. Consolidated Edison Co. of New York,* 10 F.Supp.2d 427, 434 (S.D.N.Y.1998) (citing *DeFelice v. American Int'l Life Assurance Co. of N.Y.,* 112 F.3d 61, 65 (2d Cir.1997)).

no opinion on the procedure by which the plan was ostensibly amended.

5. Even under an arbitrary and capricious standard, this Court would find that Continental's determination that Lijoi's condition had improved was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan,* 52 F.3d at 442. (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("A reviewing court must consider whether the decision was based on a consideration of the relevant fac-

tors and whether there has been a clear error of judgment.")). Continental's August 1998 decision to terminate Lijoi inexplicably and without reason ignored Lijoi's symptomatic complaints and the repeated certifications of disability from his treating physician. These are certainly relevant factors which require consideration. It relied solely on the single evaluation of its own physician and vocational expert. The December administrative appeal was *a fortiori* arbitrary and capricious in its failure to consider the intervening substantial evidence that Lijoi's recent Hepatitis diagnosis had effected his condition.

## III. Scope of Review

### A. Legal Standards

Having decided that it must engage in *de novo* review of defendant's decision to terminate disability benefits, the Court must determine the scope of the *de novo* review. Specifically, the Court must confront the issue of whether the *de novo* review is limited to the record established by the administrator, or whether the *de novo* review essentially constitutes a new trial of plaintiff's claim, giving the plaintiff the right to supply additional evidence to the Court. At issue is the factual question of whether Lijoi was disabled, under the terms of the plan, at the time Continental terminated his benefits.[6]

The Second Circuit addressed this question initially in *DeFelice v. Am. Int'l. Life Assurance Co. of New York*, 112 F.3d 61 (2d Cir.1997), holding that the review "is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *Id.* at 67. Finding good cause existed, the court noted that where good cause exists, the district court may assume an active role in order to ensure a *comprehensive* and *impartial* review of the case:

> [Where good cause exists] courts *must* exercise fully their power to review *de novo* and to *be* substitute [plan] administrators. Plaintiffs are utterly helpless against the whim of the [administrator's] interpretation of the facts. The normal scope of limited *"de novo"* review is inappropriate where the fairness of the ERISA appeals process cannot be established using only the record before the administrator ...
> [We hold that] upon *de novo* review, even purely factual interpretation cases may provide a district court with good

cause to admit evidence not available at the administrative level if the administrator was not disinterested. In this situation, the district court may assume an active role in order to ensure a comprehensive and impartial review of the case.

*Id.* at 66 (emphasis in original).

■ *DeFelice* suggested a number of factors that indicate good cause exists to admit additional evidence. It pointed to the conflict inherent in an appeals committee comprised of solely administrator personnel, and noted its concerns with a lack of established criteria for determining appeals and the destruction of appeals committee minutes immediately following meetings. *Id.* at 66. Such concerns were echoed in *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288 (2d Cir.2004), where the Circuit affirmed the district court's finding of good cause where the administrator failed to maintain sufficient written procedures for initial and appellate review of claims. Such a procedural deficiency creates "opportunities for conflicts of interests to be exacerbated and, in such a case, the fairness of the ERISA appeals process cannot be established using only the record before the administrator." *Id.* at 295, 296.

■ Once the determination has been made to admit additional evidence into the *de novo* review, the Court is not temporally bound to evidence that either was, or should have been, available to the administrator at the time it made its claim determination. In *Locher*, defendant UNUM challenged the district court's exercise of discretion to admit the testimony of Dr. Podell, an expert witness retained by the plaintiff nearly seven years after the claim

---

6. Because Lijoi has maintained throughout that he is totally disabled for any vocational purpose, the Court treats the question of his disability as coextensive with the question of vocational capacity for the purpose of establishing disability benefits eligibility.

was initially denied. *Locher*, 389 F.3d at 296–297. Locher's disability benefits had been denied by UNUM in 1993 but the plaintiff was not seen by Dr. Podell until 2000. Once the court determined that good cause existed to admit additional evidence, it admitted Dr. Podell's testimony for the purpose of "confirm[ing] the diagnosis of [Chronic Fatigue Syndrome] and disability as of April 1993, and [finding] credible Locher's account of the progress of her illness." *Id.* at 292. The ruling was upheld on appeal, with the Circuit treating UNUM's objection to the introduction of Dr. Podell's testimony as a "reiterat[ion of] its argument that the District Court improperly considered evidence outside of the administrative record." The Court further noted that once a district court properly rules to consider evidence outside the administrative record, it "may render a determination on a claim without deferring to an administrator's evaluation of the evidence." *Id.* at 296 (citing *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir.2001) (noting that, upon *de novo* review, a district court is "free to evaluate [a treating physician's] opinion in the context of any factors it considered relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence.")).

## B. Lijoi's showing of "good cause"

Lijoi asserts that good cause exists to admit additional evidence on the basis of Continental's conflicted interest and the procedural infirmities of its termination and appeals processes. Lijoi alleges the conflict of interest existed because Continental acted as both the claims reviewer and claims payor, and that the conflict of interest adversely effected Continental's claim determination in its selective scrutiny of his "high reserve" claim. He also suggests that Continental's insufficient written procedures defining its decision and appeals processes resulted in an arbitrary termination of his benefits.

To substantiate his allegations of conflict, Lijoi highlights a group of emails in the claims file that suggest Continental's role as the payor of the claim effected its decision to terminate his benefits. In one of these emails, the Continental analyst responsible for the termination decision thought that the company "really need[ed] to have a nurse look at this *because it is a high reserve claim.* It was received prior to the new process, so we have not had a nurse review ... I need to review the nurses [sic] comments after she is done *due to the focus on managing these high reserve claims.*" (CLM 202 (emphasis added)). As to the lack of written procedures guiding Continental's decision-making and review processes, Lijoi points to the deposition of the Continental analyst responsible for terminating his benefits, in which that analyst repeatedly testified to the absence of training or procedural guidelines as to how communications about claims should be recorded.[7] (*See O'Mahony Decl.*, Exhibit A at 15, 19–20, 32–33, 38). He also points to Continental's failure to obtain a detailed response by Dr. Head, his treating physician, to the evaluation of Dr. Neophytides, Continental's doctor, de-

---

7. The Court may properly consider this additional evidence *ab initio* for the purpose of determining whether there existed sufficient procedures for decision-making and appeal, as opposed to for the merits of the substantive claim determination. *Cf. Sheehan v. Metropolitan Life Ins. Co.*, 2002 WL 1424592, *4 (S.D.N.Y.2002) ("[O]ne of the proper subjects for discovery is whether [the administrator] had a conflict of interest when it terminated plaintiff's benefits. The presence or absence of a conflict of interest determines the scope of evidence that the Court can consider on factual issues in conducting a de novo review.").

spite Dr. Head's indication that he disagreed with Dr. Neophytides's conclusions and offer to provide a detailed rebuttal. (*Id.* at 129–131; *CLM* 63).

██ Continental neither disputes Lijoi's assertion that it was both the reviewer and payor of claims, nor controverts the evidence that the conflict of interest had an adverse impact on the claim determinations. Though Continental characterizes Lijoi's allegation of a conflict as speculative and conclusory, it acknowledges that "an actual demonstrated conflict of interest on the part of the administrator is an example of 'good cause' which may warrant the introduction of additional evidence," (*Continental Rep. Brief,* 23 (internal quotations and citations omitted)). The identified emails from the analyst, which strongly suggests that Lijoi's benefits were targeted for termination because his was a "high reserve claim," demonstrates that the decision-making process was actually tainted by conflict.

██ Additionally, the Court notes that Continental has identified no written procedures for handling and evaluating claims. How, for example, does Continental assess conflicting medical testimony, as that of Dr. Neophytides and Dr. Head, and why does it consider Dr. Neophytides's isolated evaluation of Lijoi more credible than the ongoing reports of Dr. Head and the multiple other doctors who evaluated

Lijoi? On what basis did Continental credit its own FCE, while finding Lijoi's vocational assessment to be lacking in objective medical findings? On what basis, if any, is a claimant allowed to supply additional medical evidence to reopen his administrative file after an appeal becomes final? These deficiencies in procedural clarity are certainly as extensive as those on which the court found "good cause" in *DeFelice* and *Locher,* and justify a wider inquiry by this Court to insure a comprehensive and impartial review of Lijoi's claim. The Court finds that Lijoi has made a sufficient showing of good cause to warrant the admission of additional evidence into the Court's review.[8]

## IV. The Additional Evidence

The additional relevant evidence submitted by Lijoi falls into four classes: (1) additional medical records from Dr. Head, not present in the claims file, that evidence the doctor's evaluation of Lijoi in 1996 and 1997, (2) subsequent medical records of Mr. Lijoi related to his treatment for Hepatitis C, (3) Lijoi's own testimony about his medical history and the claims process and (4) the findings of an Administrative Law Judge made in the course of Lijoi's application for social security disability benefits.[9] The relevant evidence is summarized briefly below and considered in the Court's determination, *infra,* Section VI.

8. Continental argues that the "law of the case" doctrine precludes a finding of good cause to introduce additional evidence, on the basis of this Court's February 23, 2005 order adopting Magistrate Judge Pohorelsky's denial of plaintiff's application to depose Dr. Neophytides. The law of the case doctrine "posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case. Application of the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *In re Crysen/Montenay Energy Co.,* 226 F.3d 160, 165 n. 5 (2d Cir.2000) (citing *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996)). Even if the February 2005 order addressed the question at issue here, which it does not, there is nothing to preclude this Court from reconsidering its own decisions prior to final judgment.

9. A number of secondary sources submitted by Lijoi, as well as a professional complaint lodged by Lijoi against Dr. Neophytides have been excluded from the Court's review.

## A. Additional records from Dr. Head

The additional medical records from Dr. Head, which were not included in the Continental claims file, consist of a detailed report of Dr. Head's neurological consultation with Lijoi on March 11, 1997, as well as an update report from May 30, 1997 and a reissue of the original report on July 9, 2001. (*Decl. of Francis Lijoi*, Exhibit A, Letter of March 11, 1997). These documents give a more complete picture than any of the documents in the Continental claims file of the clinical examinations on which Dr. Head based his conclusion that Lijoi was totally disabled. The original 13–page report describes Lijoi's personal and medical history, as well as the results of Dr. Head's clinical examination and tests, his diagnoses, comments and conclusions. Consistent with his continued certification of Lijoi as totally disabled, Dr. Head concluded in his initial report that "[a]fter a careful review of the available medical documentation, a review of Mr. Lijoi's narrative history, and a review of the results of my clinical examination of Mr. Lijoi, I would conclude that he is permanently and totally disabled ..." (*Id.* at 12). The report justifies the conclusion by reference to the results of Dr. Head's neurological examination of Lijoi, as well as a chronicle of the symptoms reported by Lijoi that rendered him disabled. The update report, from May 30, 1997, affirms the previous clinical findings and symptoms, and concludes that "Mr. Lijoi's condition and diagnoses remain unchanged." (*Id.*, Letter of May 30, 1997).

## B. Subsequent medical records for treatment of Hepatitis C

The medical records describing Lijoi's treatment of Hepatitis C are key to understanding a substantial cause of Lijoi's disability. They demonstrate that Lijoi contracted Hepatitis C while in the Army decades earlier, that he had been suffering from the undiagnosed disease prior to 1998, and that the illness has caused Lijoi serious problems. (*Id.*, Exhibits B, D, E, G, H). The records include diagnosis and treatment records, as well as reports from treating physicians and veterans administration personnel. In a September 21, 1999 letter, Dr. Geders, Chief of the Division of gastroenterology & Hepatology at New York Methodist Hospital reported:

> I saw [Lijoi] in a follow-up visit [for Hepatitis treatment] on 9/13/99 and he is still experiencing significant profound fatigue with severe limitations on even performance of his activities of daily living (ADLs). He remains in near constant pain, despite narcotic analgesics prescribed by his neurologist. As per my correspondence of January, 1999, I feel this patient remains permanently disabled.

(*Id.*, Exhibit D). A subsequent treating physician, Dr. Ayse Aytaman of the Department of Veterans Affairs, New York Harbor Healthcare System, described Lijoi's Hepatitis treatment since 2003, and concluded that "[c]hronic disabling fatigue continues to decrease his quality of life significantly and he has evidence of more advanced liver disease in his lab tests with significant thrombocytopenia, which is associated with enlargement of the spleen with advancing liver disease." (*Id.*, Exhibit G). A medical consultant of the Veterans Administration, evaluating Lijoi's VA claim, concluded that

> [Lijoi]'s records clearly show that he received Immunization by Jet Injectors while in Boot Camp. Studies have also shown that these instruments at time become infected and can transmit disease, if not properly sterilized. At least one other member of his unit also contracted Hepatitis C at the same time. There is no evidence of any additional Risk [sic] factors. The preponderance of evidence points to the likelihood that

the veteran acquired [sic] the Hepatitis C while in the Service [sic].

(*Id.* Exhibit H).

### C. Lijoi's statement

In his affidavit, Lijoi explained his personal understanding of his medical and claim history. (*See Decl. of Francis Lijoi*). With respect to his medical history, he explained that in June of 1998, he was referred by his cardiologist, Dr. Gupta, to Dr. Terzouli, a gastroenterologist, for evaluation of some of his symptoms. That doctor initiated the series of tests and evaluations which resulted in the September 18, 1998 diagnosis of chronic active Hepatitis C. He states that "none of [his] treating doctors advised [him] of the significance of Hepatitis C infection, the symptoms that it could cause, or the long term prognosis of the disease ... until approximately late November, 1998, well after Defendant Continental had denied [his] claim for benefits." (*Id.* ¶ 6). At that time, he was advised that Hepatitis C could cause "many of the disabling conditions [he] was experiencing, such as profound fatigue, aches, headaches, depression and memory loss." (*Id.*). He further describes his subsequent medical treatment, both at New York Methodist Hospital and at the Veterans Administration Hospital, as well as recent developments in the diagnosis and treatment of Hepatitis C. (*Id.* ¶¶ 8–12). Finally, he recounts his application process for Social Security Disability benefits, which culminated in May 2003 with a decision by Administrative Law Judge Harold Rosenbaum that Lijoi was disabled as defined by the Social Security Act from September 1996 on into the present day. (*Id.* ¶ 13).

### D. The findings of the administrative law judge

Lijoi has also submitted the May 2003 findings of Administrative Law Judge Harold Rosenbaum in reference to his application for Title II Disability Insurance Benefits filed on February 1, 1997. That application was originally denied by the state agency and the denial affirmed by Judge Rosenbaum in 1999. The Appeals Committee, however, vacated Judge Rosenbaum's determination and remanded it for further proceedings in 2001. In the meantime, plaintiff had reapplied for SSDI benefits in 2001 and was granted them based on his totally disabled condition. In 2003, Judge Rosenbaum conducted a hearing to determine "whether Lijoi's disability commenced prior to January 8, 1999, and in particular whether he was disabled during the period from September 9, 1996, his alleged disability date, to January 8, 1999, the disability onset date established upon adjudication of [the] subsequent claim for benefits." (*Decl. of Francis Lijoi,* Exhibit I, at 1).

As a result of that 2003 hearing, where live testimony was presented, Judge Rosenbaum made specific findings with respect to Lijoi's disabled condition beginning in 1996:

1. The claimant has not engaged in substantial gainful activity since September 19, 1996.

2. The medical evidence establishes that the claimant has had the following severe impairments since September 19, 1996: cardiac arrhythmia with pacemaker implantation, chronic disorders of the cervical, thoracic, and lumbosacral segments of the spine, chronic hepatitis C, Depuytren's disease of the hands, and an adjustment disorder with persistent anxiety and depression ...

4. The claimant's assertions concerning his symptoms of pain, depression and inability to work are credible.

5. During the period from September 19, 1996 through January 8, 1999, the claimant's overall ability to meet

the basic physical and mental demands of work was so markedly restricted by manifestations of disc disease, hepatitis, Depuytrens's disease, and mental illness as to justify a finding that he was not capable of performing his past relevant work or of meeting the basic physical and mental demands or making a vocational adjustment to any other job that exists in significant numbers in the national economy on a sustained basis.

6. The claimant was under a disability, as defined in the Social Security Act, during the period at issue, namely from September 19, 1996, the alleged onset date, to January 8, 1999, the disability onset date established when the claimant was granted benefits upon review of his subsequent application filed in May 2001.

(*Id.*).

## V. Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses ..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–4, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As an initial matter, "the moving party bears the burden of establishing the absence of any genuine issue." *Grabois v. Jones*, 89 F.3d 97, 99–100 (2d Cir.1996) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Once this has been presented, the non-moving party must produce a genuine issue of material fact with respect to all of movants' showings. A genuine issue of material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If there remains no genuine issue of material fact then the moving party is entitled to judgment as a matter of law.

## VI. The Merits of Lijoi's Benefits Claim and the Cross–Motions For Summary Judgment

■ Both parties have moved for summary judgment in this case. Weighing all of the evidence, including the additional evidence submitted by Lijoi, there is no genuine dispute over the facts that necessitate a finding that Continental's termination of Lijoi's benefits was not substantially justified and constituted an abuse of its discretion. Moreover, particularly in light of the findings made by the Administrative Law Judge, it is no longer genuinely in dispute that Lijoi has been totally disabled since 1996 as a result of his automobile accident, Hepatitis C, and related illnesses. Plaintiff is thus entitled to summary judgment on the issue of whether he was entitled to disability benefits under the "Own Occupation" period defined by his Plan. (*See Plan*, at 5).

### A. The merits of Continental's benefits determination

Continental's termination of Lijoi's benefits rested entirely on two justifications:

First, Continental asserted that Lijoi had failed to provide "objective medical findings" to support his assertion of disability. Second, Continental dismissed Lijoi's subjective reports of symptoms and pain as a basis on which to find the existence of a disability. For many of the reasons already discussed, the Court finds that Lijoi provided ample objective medical findings to substantiate his disability, and that his credible complaints of pain similarly cannot be disregarded.

### 1. "objective medical findings"

Continental's decision relied on its allegation that Lijoi's disability was not supported by "objective medical findings," defined in the plan as "includ[ing], but ... not limited to, *tests*, procedures, *or clinical examinations* standardly accepted in the practice of medicine." (*Plan*, 5 (emphasis added)). The policy does not specify the weight or extent of the objective medical findings required.

Continental provides no explanation for why the findings of its own medical and vocational specialists who saw Lijoi only once constituted reliable medical evidence, while the reports of Lijoi's specialists, who saw him on a much more extensive and regular basis, were unreliable. Comparing Dr. Head's reports of his clinical examinations of Lijoi to Dr. Neophytides's report admits of no principled distinction between the physicians' methods, only in their opposing conclusions. Dr. Head's findings, however, are corroborated by the host of other practitioners who saw Lijoi during 1996 and 1997, and have seen him since, deeming him to be totally disabled. The Court does not discredit the findings of multiple physicians as easily as Continental did, particularly when the opposing medical opinion is based on the single evaluation of a doctor hired by an insurance company that was operating with a demonstrable conflict of interest.

Moreover, setting aside the conflicting opinions of Dr. Head and Dr. Neophytides, Lijoi was diagnosed with Hepatitis C and related illnesses in September of 1998, as a result of clinical tests including multiple liver biopsies. This diagnosis ultimately explains many of the previously difficult to treat symptoms. Despite his prompt notice to Continental of his diagnosis, however, the insurer did not consider how the Hepatitis effected him, or allow him to supplement the new diagnosis with subsequent treatment data. Lijoi was not diagnosed with Hepatitis and Chronic Fatigue Syndrome until late summer 1998. He was unaware of how the Hepatitis C could effect him symptomatically until November. It soon became clear, however, based on the statements of the physicians who treated him for the new diagnoses, that many of the symptoms dating back to 1996 were a result of the diseases, and that the absence of the diagnosis was the reason why his symptoms had gone without satisfactory explanation. Continental has provided no evidence to controvert the medical findings that were made in late 1998 and early 1999.

Evaluating all of the evidence, the Court finds that there is no genuine dispute as to the existence of "objective medical findings," as defined by his plan, that support a conclusion that Lijoi was totally disabled. The plan does not specify the weight or extent of the objective medical findings required to award benefits, and Continental's efforts to minimize or discredit the findings provided by Lijoi amount to rewriting the terms of the plan.

### 2. subjective complaints

Continental also relied extensively on its conclusion that Lijoi's symptoms were solely substantiated by his subjective complaints. Even if this were true, however, the law in this Circuit is clear that

"the subjective element of pain is an important factor to be considered in determining a disability." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir.2001) (citing *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir.1984)).[10] While a district court "is not required to accept such complaints as credible, it cannot dismiss complaints of pain as legally insufficient evidence of disability." *Connors*, 272 F.3d at 136 (citing *Aponte v. Sc'y of the Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984) (stating that it is the function of the factfinder to appraise the credibility of witnesses's complaints of pain); *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir.1983) (citing plaintiff's frequent complaints to his wife and neighbor of headaches and neck pains and his testimony about same as "overwhelming, substantial evidence" of the extent of plaintiff's pain); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979) ("[T]he subjective evidence of appellant's pain, based on her own testimony and medical reports of examining physicians, is more than ample to establish her disability, if believed.")).

The extensive record of examinations, diagnoses, and treatment of Lijoi by a battery of physicians should have, at the very least, caused Continental to entertain the probability of credence to his subjective complaints in December 1998. It appears to the be the case, however, that Continental callously concluded that his subjective complaints were unsubstantiated, even in the face of the increasingly extensive record, and that his complaints were feigned. That capricious and arbitrary determination was belied not only by

the extensive medical record, but has now been confirmed by the explicit credibility determination made by Judge Rosenbaum, after a full hearing with live testimony. This Court finds that Lijoi's accounts of pain and disability fully substantiate a finding that he was fully disabled from 1996 through May 29, 2003. *See McBrayer v. Secretary of Health and Human Services*, 712 F.2d 795, 798 (2d Cir.1983) (stating that the court "must credit an ALJ's findings if supported by substantial evidence.").

## B. The cross-motions for summary judgment

In light of the claims file evidence and all of the appropriately introduced additional evidence, there is no longer any genuinely disputed fact as to whether Lijoi was disabled and eligible for long term disability benefits during the Own Occupation phase of the plan. Lijoi has demonstrated that he is entitled to a summary judgment award of benefits for the period of time between September 1996 and the expiration of the "Own Occupation" period on December 16, 1999.

## VII. Declaratory Judgment

### A. Legal standards

The Declaratory Judgment Act provides that this Court "may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought.*" *28 U.S.C. § 2201(a)* (emphasis added). Declaratory judgment "afford[s] a

---

**10.** *Connors* involved a case with facts remarkably similar to this one. Ignoring the continued opinion of the treating physician that Connors remained disabled, the plan administrator terminated his benefits, finding Connors no longer totally disabled on the bases of its own medical evaluation, the opinion of its vocational rehabilitation specialist, and its conclusion that Connors's subjective complaints of pain were clinically unsubstantiated. The district court decision upholding the administrator's determination was vacated by the Second Circuit in part because the district court failed to consider the credibility of Connors's complaints of pain.

speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321 (4th Cir.1937). "A declaratory judgment action should be entertained when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556 (2d Cir.1991) (citing *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986)). The decision to grant declaratory relief rests in the sound discretion of the district court. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–290, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

 As a threshold matter, "[a] party seeking a declaratory judgment bears the burden of proving that the district court has jurisdiction. Jurisdiction exists only if there is an actual controversy, which has been defined as one that is real and substantial admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154, 177 (2d Cir.2001).

#### B. Lijoi's prayer for declaratory relief

In addition to an award of benefits under the Own Occupation phase of his disability policy, Lijoi seeks a declaratory judgment that he is qualified for disability benefits under the Any Occupation phase of the Policy. During the Own Occupation phase, plaintiff must show that he is unable to perform his own occupation because of his disability. When the Own Occupation period expires after thirty-six months, the claimant must make an additional showing to collect benefits during the Any Occupation period. Essentially, he must show that not only is he disabled and unable to perform his own occupation, but that he is unable to perform any occupation. *See Plan* at 5. Lijoi would have been entitled to an administrative determination of his entitlement to Any Occupation benefits as of December 16, 1999. Because Continental arbitrarily terminated his benefits in August 1998, however, he was never afforded that opportunity. Such a review is now more than six years overdue, and in the meantime, Lijoi's physical condition has continued to deteriorate.

 Lijoi has made a satisfactory showing for this Court to assert jurisdiction and consider an award of declaratory judgment. At oral argument, counsel for Continental inexplicably refused to acknowledge, even in light of Administrative Law Judge Rosenbaum's findings, that the available evidence clearly establishes Lijoi's total disability from 1996 up until May 29, 2003, when the findings were made. She stated her client's intention, if this Court should remand the matter for further administrative processes, to initiate an entirely new review of Lijoi's claim under the Any Occupation phase of the Policy. Considering Continental's egregious refusal to consider evidence provided to it in its initial termination proceedings, its subsequent obstinance in the face of judicial findings, and the vexing litigation to which it has subjected Lijoi, this controversy could not be placed in starker relief, its facts any clearer, or the usefulness of a declaratory judgment more apparent. Given that the Court need not await any

further violation of rights where it can relieve the parties of uncertainty, insecurity, and controversy through a clear judgment, the Court grants Lijoi's prayer for declaratory judgment.

■■■ The Court acknowledges Continental's argument that "absent a decision by the plan administrator, a district court lacks jurisdiction to make an assessment of a beneficiary's eligibility for benefits." *Peterson v. Continental Casualty Co.*, 282 F.3d 112, 118 (2d Cir.2002) (citing *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 140–41 (2d Cir.2000) (stating that "claim for further disability payments had yet to be determined even administratively and [plaintiff's] request for prejudgment interest was premature.")). *Peterson* is distinguished, however, in that the district court entered a judgment compelling a determination from the administrator on Any Occupation benefits several months before the Own Occupation period ended. In that case, the Circuit held that because "Peterson's occupation period was not yet complete, his eligibility for permanent benefits was not an issue ripe for determination by the claim administrator." *Peterson*, 282 F.3d at 118. The *Peterson* court relied upon a single case, *Jones v. UNUM Life Ins. Co. of America*, 223 F.3d 130, (2d Cir.2000), in which the circuit simply affirmed a district court's dismissal of a case for lack of jurisdiction pending an additional determination of benefits eligibility.[11] Neither of the cases addressed the propriety of a district court granting declaratory judgment when it finds, as this Court finds, that (1) as a result of the administrator's improper denial of benefits, (2) the plaintiff has been prevented from receiving

a determination on his eligibility for permanent disability benefits for several years, and that (3) the record clearly demonstrates that any subsequent denial of benefits under the Any Occupation phase would have constituted an abuse of the administrator's discretion. *Jones* left open the possibility that a plaintiff might not need to exhaust administrative review where he makes "a clear and positive showing that seeking review by the carrier would be futile." *Jones*, 223 F.3d at 140. This Court finds that based on Continental's demonstrably arbitrary actions and the Administrative Law Judge's finding of total disability up until April 24, 2003, it would be futile to require any additional administrative review of the claim for that period of time and would only serve Continental's dilatory purpose. The Court enters a declaratory judgment in favor of Lijoi that he is entitled to disability benefits under the Any Occupation phase from December 17, 1999 until May 29, 2003, the date of Judge Rosenbaum's findings.

Moreover, the record is clear that Lijoi's medical condition has not improved since 2003. Plaintiff has supplied additional medical records for the year 2004 and 2005 demonstrating a continuous deterioration of his condition. *See Lijoi Decl.*, Ex. E, G, H. The Court grants Lijoi's prayer for a declaratory judgment that he is entitled to benefits under the Any Occupation phase of his policy for the period of time since May 29, 2003, and that in the absence of any medical evidence to the contrary, he continues to be totally disabled and eligible for benefits under the Any Occupation phase of the Policy.

---

11. The *Peterson* Court did cite three other cases: *Pagan*, 52 F.3d 438; *Miller v. United Welfare Fund*, 72 F.3d 1066 (2d Cir.1995); and *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.), cert. denied, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983). Each of those cases, however, addresses only the general question of what standard of review governs a court that obtains jurisdiction over an ERISA determination.

## VIII. Attorneys' Fees

 In an ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *29 U.S.C. § 1132(g)(1).* Whether or not to grant such a request generally depends upon five factors:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir. 1987).

 As to the first and fourth factors, which are intertwined, the Court declines to find that Continental acted in bad faith, though it's a close call considering the evidence of its actual conflict of interest in reviewing claims, its continued litigation of its position and refusal to admit that it made an erroneous determination despite mounting evidence, Judge Rosenbaum's findings, and its insistence that even now it needs to initiate a new claims procedure for Lijoi to obtain his permanent disability benefits. In any event, Continental surely bears a high level of culpability for, *inter alia,* its conflicted claims determination process, its failure to adopt written procedures for handling claims, its failure to credit either Lijoi's or his doctors' attestations of disability and its failure to consider new evidence submitted on his behalf. These factors strongly militate in favor of an award of attorneys' fees for Lijoi.

As to the second factor, there is no question that Continental is in a position to satisfy an award of attorneys' fees. This factor weighs in favor of Lijoi.

The third factor, deterrence, also weighs in plaintiff's favor. This Court would hope that no insurer in a situation similar to Continental's would choose to litigate the issue for seven years, rather than recognize its error, reverse its decision, and award benefits. Perhaps a future insurer will consider that in addition to the benefits that it will be obligated to pay as of right to the plaintiff, it will also be responsible for the attorneys' fees incurred as a result of its obstinance, however nominal that fee might be in relation to the hardship its delay tactics impose upon a disabled plaintiff.

Finally, though the fifth factor is irrelevant to this case, its absence does not preclude an award of attorneys' fees. *See Mendez v. Teachers Ins. and Annuity Ass'n and College Ret. Equities Fund,* 982 F.2d 783, 789 (2d Cir.1992) (citing *Ford v. New York Cent. Teamsters Pension Fund,* 642 F.2d 664, 665 (2d Cir.1981) (per curiam)). At least one court has observed that while a wrongful termination of benefits is not a "common fund" case, an award of attorneys' fees "serve[s] to bring under scrutiny the application of questionable evaluation practices with respect to a difficult-to-diagnose and difficult-to-treat ailment." *See Locher,* 389 F.3d at 299. Such justification also weighs in favor of an award of attorneys' fees for the plaintiff.

In consideration of the foregoing factors, the Court orders an award of reasonable attorneys' fees and costs to Lijoi.

## CONCLUSION

For the foregoing reasons, defendant's motion for a judgment on the pleadings pursuant to Rule 12(c) is converted to a motion for summary judgment pursuant to Rule 56 and denied.

Plaintiff's cross-motion for summary judgment is partially granted. Judgment in favor of the plaintiff should be entered

with respect to his entitlement to disability benefits through the Own Occupation period of the policy. Plaintiff's cross-motion for summary judgment for benefits during the Any Occupation period is denied.

Plaintiff's request for declaratory judgment is granted. The Court declares that Lijoi (1) has been permanently disabled under the Any Occupation phase of the Policy from December 16, 1999 through the present (2) is entitled to permanent disability benefits under the Any Occupation phase of the Policy for that period of time and (3) that on the basis of the medical evidence in the record and the absence of any medical evidence demonstrating any improvement to his condition, he continues to qualify for Any Occupation benefits.

Plaintiff's counsel may submit a calculation of disability benefits, with interest, to which plaintiff is entitled, along with records and documentation for attorneys' fees and costs from Continental as required by *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2d Cir.1983).

SO ORDERED.